RICHARD L. POWELL

*v.*

JOHN H. CASH.

1. It is the duty of the owner of a going business, whose value consists in part of good will, who proposes to sell an interest therein to an incoming partner, to make a full, fair and complete disclosure to the purchaser of all matters tending to affect the value of the good will.

2. In such case if the success of the business depends upon the personal knowledge and business capacity of the vendor, and his health is such as to render it doubtful if he will be able to give personal attention to the business, it is his duty to disclose his disability to the incoming partner before entering into a partnership agreement by which he covenants to give such personal attention.

3. If, after entering into such partnership articles and before the partnership actually commences, the vendor finds there is danger that his health will not permit him to continue in the business and give it his personal attention, he should, on the request of the incoming partner and in the absence of any change of circumstances working an equitable estoppel, consent to a rescission.

On final hearing on bill, answer and proofs.

*Mr. John Griffin,* for the complainant.

*Mr. Craig A. Marsh,* for the defendant.

PITNEY, V. C.

Complainant by his bill asks to be relieved from a partnership agreement in writing entered into by him with the defendant, and to be repaid a certain sum in cash and a promissory note paid and delivered to defendant thereunder, as payment for a share of the partnership plant and business.

The grounds of the relief are, first, that the defendant misrepresented the value of his business to complainant, or, at least, did not give complainant such a full and fair statement of its value as under the circumstances complainant was entitled to; and second, that he did not intend, in good faith, to form a continuing partnership, but adopted the device of a partnership agreement as a means to sell out his business and entirely withdraw therefrom, and was unfit physically to perform the duties involved.

The partnership agreement is dated on the 24th of November, 1894, and provides for the formation of a partnership under the firm name of "Cash & Powell," for the purpose of carrying on and continuing the established business theretofore owned and conducted by Cash, consisting of a printing establishment for general job printing, and also for printing, editing and publish-

ing a newspaper at Westfield, Union county, New Jersey, called "The Westfield Leader." The plant and good will were valued at $3,000, and complainant was to pay the defendant $1,000 for a one-third interest therein, and was to contribute in addition thereto $100 as working capital, and defendant was also to contribute a like sum of $100 as working capital. There was the usual clause that neither party would engage in any other business during the continuance of the partnership, but use their best efforts for their mutual advantage and the increase of the stock, business and profits. No time was fixed for the continuance of the partnership, but the provisions of the agreement contemplate a long continuance. The actual practical commencement of the partnership was to be on the 1st day of July, 1895.

At the time of entering into the contract, the complainant was about thirty-five years of age, and his occupation was that of school teaching, in which he was engaged in Bergen county, and he had no knowledge or experience whatever of job printing or conducting a newspaper. The defendant had established and conducted the newspaper for several years, but was himself not fitted to look after the editorial department, and had been obliged to hire that part of the work done.

On the 21st of October, 1894, there appeared in the New York "Tribune" a notice as follows: "Wanted, partner; newspaper and printing, 18 miles from city, in flourishing town. Small capital required, if right man. Address C. E., Tribune office." The complainant wrote the defendant by the address so given, on the 22d of October, and received a reply from defendant dated the 24th of October, in which defendant intimated that he wished a partner who could act as editor of the paper, and invited him to come and see him and the newspaper. On the next Saturday, October 27th, complainant visited the defendant, with whom he had no previous acquaintance, at his office in Westfield, and introduced himself, and swears positively that on that day he asked the defendant as to the net income of the paper, and that the defendant said it was over $100 a month. The defendant denies this, and states that he never, at any time, stated what the income of the paper was, and that he professed

Powell v. Cash.

ignorance of it.   But the complainant's story is supported by pencil memoranda made by himself, and written down, as he swears, at the moment, in the presence of the defendant, in the office of the newspaper, on the back of the letter which defendant had written him and the envelope in which it was posted. These memoranda are a list of the principal items of the material plant, and then the following figures, which complainant swears he took from the lips of the defendant, viz., that the job work amounted to $75 a month, the advertising to $100 a month, and the subscription and sales of newspapers to $20 a month, making a total of $195, and that the expenses were $80 a month, leaving a net income of $115 a month.   Complainant further asked for the weekly details, and they were given to him as $25 a week for advertising and $5 a week for subscriptions and sales; and other items were given him as being the actual receipts for previous months.   Valuations were also put upon the different articles of plant.   All these appear on the back of the letter and envelope written by defendant to complainant on October 24th, 1894.

The defence of the defendant to this part of the case is that all the information that the complainant got as to the income of the newspaper was derived from his own inspection of the books and files of the newspaper themselves; but there was no pretence on the part of the defendant that there was any such inspection made by the complainant on this first visit, October 27th.

Not satisfied with that interview, complainant went again on Saturday, the 3d of November, and had in his pocket a passbook in which he had written in ink beforehand certain matters upon which he wished to have definite information, to wit, the items of the income of the paper and the items of expenses. On that occasion, as he swears, he sat down in the publication office with the defendant, who handed him some blank writing paper, and upon it he took down from defendant's dictation the items of receipts and disbursements for twelve months past, which the defendant gave him himself, partly from the cashbook and charge-book for job printing, and partly from the files

Powell v. Cash.

of the newspaper and contracts for yearly advertisements. Those memoranda have been produced, and their appearance strongly attests their genuineness. They show as follows : That there were various yearly advertisements in the newspaper which amounted in the aggregate to $484, and various weekly advertisements which amounted in a year to $905.84, making a total of $1,389.84, to which were to be added certain special advertisements or extras, as they were called, which amounted to $146, making a total of $1,535 for advertisements. These, it will be observed, could only be taken accurately from a copy of the newspaper by a person who was familiar with the charges for advertisements and knew which were inserted by the year and which by the week, and, after all, their accuracy depended upon whether the particular number of the newspaper from which they were taken represented a true average of the weekly advertisements. It would be quite impossible for the complainant, who was entirely inexpert in the business, to get those figures without the assistance of the defendant. The defendant gave him the amount of job work for twelve months past, which footed up $539.65. Then he gave him the subscriptions and sales at $159, making a total of $2,233, or $186 a month, which, deducting $80 a month for expenses, left a net monthly income of $106, or $9 less than what the defendant had represented to him just a week previously. These memoranda are produced and supported by the oath of the complainant, and I consider them reliable. In addition to that, defendant gave the items of the expenses in making up the $80 a month—for rent, $12 ; for typesetting and work in the office, $28 a month ; editorial service, $24 a month ; supplies, paper &c., $11.30 a month ; job paper and coal &c., $5 a month, making a total of $80. Then, according to the complainant's story, the defendant took off from the cash-book the actual receipts in cash for twelve months previous to that date in monthly items, and complainant wrote them down in his pass-book, and they amounted to $1,805.91. When asked how he accounted for the difference between $1,805.91 and $2,233, taken from the files of the newspaper, he said the balance was receipts for advertisements paid in trade.

Powell *v*. Cash.

The defendant and his witnesses swear. that this examination of the books, contracts and newspaper files was made .by the complainant personally, and that he had abundant opportunity to ascertain the whole income of the paper. But I am satisfied that the complainant's account is substantially true, and that he was quite incapable of himself estimating from an examination of a single copy of the newspaper, or of the files, or of the books, all of which were produced in evidence, what the actual net income of the newspaper was; that, in fact, he had not time to do so, and that he must have relied upon the defendant's statement.

On that day—the 3d of November—a preliminary agreement was executed between the parties, which was finally merged in the agreement of November 24th.

At the execution of the agreement the complainant paid the defendant $600 in cash, and gave him a non-negotiable note for $400, strictly. in accordance with the terms of the agreement, and set about fulfilling his part of the contract.

Subsequently and shortly after the 13th of January, 1895, complainant's attention was called to an advertisement in a New York paper, in these words:

"For sale—Two-thirds interest in a country weekly newspaper, eighteen miles from city; prosperous town; good opening for job printing trade. Address J. J. W., Tribune office."

He thereupon wrote a decoy letter, dated Auburn, Salem county, New Jersey, signed in a fictitious name—S. S. Waters— to "J. J. W., Tribune office," asking particulars, and in reply got the following letter:

"WESTFIELD, New Jersey, January 22d, 1895.
"*S. S. Waters, Esq.*:

"DEAR SIR—Yours to hand. I have made no deal yet. If you would like to buy an interest in a paper and a printing business, and want to locate in a growing town, I think it would be to your interest to come out to see me. 'The Leader' is established and is doing good business. You will know more about what I.have to sell if you will come out to see me, say Saturday, or any time you choose. I have steam in the office and all necessary appliances.
"Very respectfully,
"J. H. CASH."

Powell *v.* Cash.

This advertisement and letter excited the suspicions of complainant that he was merely being made use of by the defendant as a means of getting the latter out of business, and he immediately wrote the defendant, asking to be relieved from his contract and have his money and note returned to him, based not upon the advertisement or any fraud or misbehavior on the part of the defendant, but solely on his (complainant's) inability to make the necessary payments. In reply to that letter, defendant declined to relieve complainant, and then complainant complained to defendant of his conduct in seeking to sell out, and charged him with not having entered into the partnership in good faith, and stated his suspicions that the business was not worth the money he was paying for it. Further letters passed and interviews took place between the parties, and a close examination was made of the files of the newspaper and the cash and other books of the defendant, in order to ascertain just what the net profits of the business were. There was no pretence that the material—engine, press, type and so forth—on hand would amount, at any salable valuation, to the sum of $3,000, although an inventory was made up which attempted to bring them up to that price. The value of the business consisted not only in the machinery and material on hand, but in the amount of patronage of the office—that is, the good will of the business. As to the result of this investigation, the parties again are not agreed. Complainant makes up a statement of receipts and disbursements taken from the books, which shows that the net income was not more than $600 or $800 a year. Defendant, on the other hand, makes up a statement by which he shows that the net income was between $1,200 and $1,300 a year. I have given these statements the best examination I could, and I conclude that neither of them is entirely reliable. The complainant has naturally belittled the profits, and the defendant has, on the other hand, naturally inflated them. In order to make them as much as possible, he has taken into account what are called "trade advertisements"—that is, advertisements the pay for which he takes in specific articles. Among them are axle grease, machine oil, encyclopædia, type for use in printing,

Powell v. Cash.

which was not charged to expenses, lamps for family use, photographs, revolvers, condition powders for horses, electrotype cuts for use in business, not charged as disbursements, wood for use in business and at his house, millinery and dry goods for his family, crayon pictures, trees for planting, household utensils, clothing, railroad passes, office furniture, Dobbins' soap, screen doors for his house, silverware, photographic kodak, sewing machine, dinner set, fur cloth, carpets and other things of that sort which could only be disposed of with difficulty and in limited quantities. Some of these articles were, indeed, worked off for cash, and, as I recollect the evidence, were included in the cash receipts entered on the cash-book. Then, as I understand the defendant's statement, he makes little or no allowance for bad debts or the natural wear and tear and depreciation in the plant from year to year; and many items which should have been charged to expense account were treated as additions to the plant, while, in fact, they were no more than sufficient to keep it up to its proper condition. The running expenses were underestimated.

The complainant charges the defendant with fraud in this respect. It appears that at the early interviews, when asked about the value of his business, defendant stated, as we have seen, that it was worth $100 a month, and when asked about his books said he did not keep any that could be called regular books of account; and in that he was correct. His books consisted simply of blotter entries in three or four different books, one for job printing, another for advertisments, another a list of subscribers to the paper, and another a sort of cash-book. Complainant certainly did have access to these books, but as before stated, I am not satisfied that he made so thorough an examination of them as defendant by his evidence and witnesses tries to prove.

I do not find it necessary to determine the precise issue of actual fraud raised by the parties on this part of the case. I acquit the complainant of any lack of proper vigilance or of any negligence in his preliminary investigation. He was entirely unacquainted with the details and ins and outs of the business,

---

Powell v. Cash.

---

while the defendant was fully acquainted therewith, and, under the circumstances, complainant was entitled to. rely upon the general statements and representations of the defendant. Moreover, it was the defendant's duty, when selling an interest in a business with which the complainant was not familiar, in connection with a partnership between the two to carry it on, to disclose in the fullest and completest manner the actual situation, profits and value of the enterprise. This duty arises from the nature of the contract of partnership. It contemplates the utmost confidence in each party and the utmost fairness, frankness and honesty in all their dealings. So that the question here is not whether if Mr. Powell had made a complete purchase of the whole plant at the price agreed on, disassociated with any partnership, the conduct of the defendant would be such as to entitle the complainant to rescind the contract. The rules applicable to such a transaction are quite different from those applicable to the transaction actually under consideration.

Mr. Justice Lindley, in speaking on this subject (*1 Lind. Part. 303*), says:

"The utmost good faith is due from every member of a partnership towards every other member, and if any dispute arise between partners touching any transaction by which one seeks to benefit himself at the expense of the firm, he will be required to show, not only that he has law on his side, but that his conduct will bear to be tried by the highest standard of honor. Thus, if one partner knows more about the state of the partnership accounts than another, and concealing what he knows, enters into an agreement with that other, relative to some matter as to which a knowledge of the state of the account is material, such agreement will not be allowed to stand. *This obligation to perfect fairness and good faith is, moreover, not confined to persons who actually are partners. It extends to persons negotiating for a partner, but between whom no partnership as yet exists,* and also to persons who have dissolved partnership, but who have not completely wound up and settled the partnership affairs; and most especially is good faith required to be observed when one partner is endeavoring to get rid of another or to buy him out."

And Mr. Clement Bates (*2 Bates Part.* § *897*) says:

"There may be a right to rescission or dissolution, with indemnity and return of premium, *even where the misrepresentations are not sufficient to sustain an action for deceit.*"

Powell *v.* Cash.

And such are the authorities: *Redgrave* v. *Hurd, 20 Ch. Div. 1 (1881-82),* where the subject is exhaustively treated by the master of the rolls and his associates in the English court of appeals; *Newbigging* v. *Adam, 34 Ch. Div. 582 (1886),* where the subject is again exhaustively treated and the previous authorities considered.   The head-note of the case is this: "A person who has been induced to enter into a contract of partner-ship by misrepresentations, *not* such as would entitle him to bring an action of deceit for damages, has a right, on the con-tract being rescinded by the court, to be indemnified against the debts and liabilities of the partnership.  This is not giving dam-ages, but is the proper consequence of rescinding the contract."

*Redgrave* v. *Hurd, supra,* was a case where a solicitor agreed to sell an interest in an established practice to an incoming part-ner, and representations were made, as here, as to the amount of the net income of the business, and the incoming partner exam-ined for himself the books of the party.   Reliance in support of the contract was placed upon the fact that the party attempt-ing to evade it had made an examination of the books himself; but the court held the doctrine, afterwards adopted in this court, with a full citation of the authorities, in *Turner* v. *Houpt, 33 Atl. Rep. 29* (at *p. 33*), viz., that where untrue representations are made by a vendor to a vendee, the vendee has a right to rely upon them, and the fact that he has had an opportunity to examine, and did examine, for himself will not avail the vendor unless it appears affirmatively that the vendee did rely upon his own examination and not upon the statement of the vendor.

In the same direction is *Richards* v. *Todd, 127 Mass. 167,* and *Oteri* v. *Sealzo, 145 U. S. 578.*

The case of *Uhler* v. *Semple, 5 C. E. Gr. 288,* is not in con-flict with the doctrine sustained by the line of cases just cited. There the dispute arose over the actual value of a manufacturing plant disconnected with any good will, which was turned in by a partnership in which the complainant bought an interest, and he was competent to judge, and did make an actual judgment, on the value of that plant.   Here the complaint is not of the value of the printing plant itself, but of the good will of the

newspaper and business therewith established and in which the complainant purchased an interest.

My conclusion on this part of the case is that the agreement of partnership was entered into under a misapprehension by the complainant as to the actual value of the good will of the business, and that the defendant is so far responsible for that misapprehension as that he ought not to insist upon the continuance of the agreement, especially as he had not in anywise altered his position at the time when the complainant demanded a rescission. This demand was made promptly and persisted in, and the defendant was, in my judgment, bound in equity to accede to his request and to return him his money and his promissory note.

I am also of the opinion that the complainant has made out his case as to the second ground of recovery, viz., that the defendant was not in a condition of health to warrant him in entering into this partnership. Here it is to be again observed that the complainant was entirely inexpert in the business, knew nothing about conducting a newspaper, and must have relied, and was entitled to rely, upon the defendant's knowledge of that business and his ability to attend to it. The personal capacity and disposition of the defendant to perform his part of the duties of the partnership was, of course, one of the considerations which induced the complainant to enter into it, and if the defendant was laboring under a personal disability by reason of his health to perform the duties he undertook, he should not have entered into the partnership without disclosing that disability; and when, later on, before the partnership was actually launched, he became aware that he would probably not be able to continue to perform his duties, he should have promptly informed the complainant and offered him the option of rescission.

The complainant charges, by an amendment to his bill, founded on evidence that came out unexpectedly upon the hearing, that the original object of the defendant in seeking a partner was to use that as a means of getting out of the business advantageously; and the evidence certainly does so indicate. The hired editor employed by the defendant was a Dr. Morse, a

physician, who had retired from practice and was living at Westfield.  He was called as a witness by the defendant.  He had been the editor for four years.  He was asked by the defendant's counsel if he knew Mr. Powell, and said that he did.

"*Q.* When and where did you first see him to know him?

"*A.* Would you like me to relate the circumstances?

"*Q.* Yes, sir.

"*A.* Mr. Cash is a man in delicate health; it was recommended to Mr. Cash that he should get out of the business he was in.  * * *

"*Q.* (By the court)—When was it recommended to Mr. Cash that he should get out of the business?

"*A.* Previous to that.

"*Q.* Previous to the time he first advertised?

"*A.* A year previous to that; I was about to relate to you the circumstances.

"*Q.* The question was whether you knew that he put the first advertisement in the paper for a partner?

"*A.* I knew he did."

Then on the 13th of January, 1895, after the execution of the agreement, he inserted the second advertisement in the paper which has been already alluded to, and his excuse given on the stand for doing that was that he was advised by a physician that he must get out of the business.

Now, this shows that the defendant intended, if practicable, to entirely retire from the business.  This he had no right to do, and at the same time to hold the complainant to his contract. He says that he would not have sold out without the consent of the complainant.  I should be more ready to place confidence in that statement if he had first consulted the complainant before inserting the advertisement, and had not inserted it in such a blind way.  Be that as it may, I think the complainant was not obliged to continue the partnership with a man in such a precarious state of health that he might be obliged at any time to discontinue his personal attention to the conduct of the business, and that it was the duty of the defendant, under those circumstances, to have acceded to complainant's demand to return him his money and promissory note.

It is urged against complainant that the real reason why he desired to recede from the contract was that he was unable to

make the moneyed payments provided for by it. It is probable that such disability actually existed, but I am unable to see how it is a bar to his relief if he has good grounds for it. It was certainly his duty to state his disability frankly at the earliest moment to the defendant, and to ask to be relieved, and he did so. If his pecuniary resources had been greater he might have felt that he could afford to undertake the business without the assistance of the defendant, and carry it on for a year or two at a less gain than he had anticipated, in the hope of finally building it up and making a success. But his pecuniary straits forbade such a venture. The evidence shows that he expected, by his exertions in canvassing for advertisements and other energetic work, to immediately increase the business. This he could not do with a sick partner whose health forbade him to be confined to the printing office, attending to that part of the business for which he was peculiarly fitted. Complainant's inability to meet his pecuniary obligations may lead us to look with distrust upon his statement of the result of his examination of the books of account and files of the newspaper made in March, 1895, but beyond that I cannot see that it has force.

So with his attempt to sell out to Dr. Morse, the editor, made by letter on March 25th, 1895. The letter was written while his examination of the books and so forth was being made, and in it he offered to sell out at a loss of $100. This was in no sense a waiver of his right to a rescission, nor a ratification of the contract. It was evidently based upon the idea that the transfer of interest, if made, would be with defendant's consent and would end all controversy between them.

Upon the whole case it is manifest that, after the clandestine manner in which the defendant sought a purchaser for his remaining share of the business and the results of the examination of the real value of the business which followed it, these parties cannot have that respect and confidence in each other which is necessary for successful partnership, and that the complainant is entitled to a dissolution. The only question is upon what terms it shall be had. Shall it be a rescission with the return of the capital contributed, or an ordinary dissolution with an account-

ing?   For the reasons above stated, I think it should be a rescission, and that defendant should deliver to complainant his promissory note and repay him the cash payment, with interest from April 1st, 1895.   Complainant is entitled to costs.

I will advise as above.